IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STANLEY YELARDY,                )
                                )
          Plaintiff,            )
                                )          Civil Action No. 03-1032 (GMS)
                                )
                                )
STANLEY TAYLOR, RAPHAEL         )
WILLIAMS, JOSEPH MEDFORD,       )
MARK CANNON,  PERRY PHELPS,     )
and JOSEPH  SABATO,             )
                                )
          Defendants.           )

## MEMORANDUM

## I.    INTRODUCTION

The plaintiff, Stanley Yelardy ("Yelardy"), filed this *pro se* civil rights action on November

13, 2003, pursuant to 42 U.S.C. § 1983.  At the time of filing, Yelardy was a pre-trial detainee at the

Howard R. Young Correctional Institute ("HRYCI").[1]  The complaint, supplements thereto, and

amended complaint allege that Stanley Taylor ("Taylor"), Raphael Williams ("Williams"), Sergeant

Joseph Medford ("Medford"), correctional officer Mark Cannon ("Cannon"), the Quick Response

Team ( the "QRT"), Lieutenant P. Sheets ("Sheets"), Deputy Warden Perry Phelps ("Phelps"),

Lieutenant Joseph Sabato ("Sabato"), correctional officer Courtney Rivera, and the Delaware

Department of Corrections (the "DOC") (collectively, the "defendants") violated Yelardy's First,

Fourth, Eighth, and Fourteenth Amendment rights.[2]  Presently before the court is the defendants'

---

[1] After initiating the instant case, Yelardy was transferred from HRYCI to the Delaware
Correctional Center in Smyrna, Delaware.

[2] On March 2, 2006, the court issued an Order (D.I. 84) dismissing McClain, the QRT, Sheets,
Rivera, and the DOC from the case, without prejudice, due to Yelardy's failure to effect service
on them.  The court, therefore, need not address the merits of Yelardy's claims against them.

motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the court will grant in part and deny in part the defendants' motion.

## II.     BACKGROUND

The following facts are taken from Yelardy's complaint and supplements or amendments thereto.  Yelardy claims that the defendants violated his rights by: (1) subjecting him to a life threatening situation within the prison; (2) providing an unhealthy living environment; (3) carrying out unreasonable searches; (4) placing limits on visitation; (5) providing him with inadequate medical attention; (6) censoring his reading materials; and (7) providing inadequate means to litigation. (D.I. 2, at 5-15; D.I. 8, at 1-6; D.I. 15, at 4-7.)

### A.     Life Threatening Situation

Yelardy first alleges that, on April 7, 2003, the prison food cart ran out of noodles, greens, and dessert, and he was offered only bread and sauce for dinner.  (D.I. 2, at 5.)  Yelardy alleges that Medford ordered him to eat what was available or "lock-in" his cell.  (Id.)  Refusing to do either, Yelardy requested to speak to a sergeant, and proceeded to sit down at the meal table.  (Id.)  As a result, correctional officer Cannon called a Code 3, the prison code for a riot.  (Id.)  Further events transpired, and Yelardy was subsequently charged with a "Demonstration" Department of Correction violation.  (Id.)

Yelardy's complaint supplements (D.I. 8) further allege that the defendants subjected him to a life threatening situation by "fail[ing] to institute a rational classification scheme, which deters victimization of the plaintiff."  (D.I. 8, at 1.)  According to Yelardy, he is housed in a unit that contains mixed pre-trial detainees, without regard to the nature of their offenses, as well as sentenced inmates and inmates serving life sentences with no possibility of parole.  (Id.)

### B.       Unhealthy Living Environment

The complaint also raises several claims regarding the living conditions at HRYCI.  (D.I. 2, at 10.)  Yelardy first alleges that three inmates are housed in a cell built for one person, due to overcrowded conditions at the facility.  (Id.)  Yelardy further alleges that Taylor and Williams are both responsible for and aware of the constitutional violations that exist at HRYCI, specifically men sleeping on the floor due to overcrowding.  (D.I. 26, at 4.)

Yelardy's first complaint supplement contains more allegations with respect to the unhealthy environment maintained at HRYCI.  Specifically, Yelardy alleges that his cell lacks adequate heating.  (D.I. 8, at 5.)  According to Yelardy, his cell is so cold that he is in constant pain and discomfort, "suffering from aching bones, and [has] been to sick-call where the nurse prescribed analgesic balm and Ibuprofen."  (Id.)  Yelardy also complains about the number of blankets he has been able to procure, and alleges that he must remain in bed, under the blankets "to maintain [his] body heat while in [his] cell."  (Id. at 6.)  Yelardy alleges that he has complained to numerous correctional officers, several lieutenants, and the supervisor of counselors, in addition to filing a grievance, all to no avail.  (Id.)

Finally, with respect to his "unhealthy environment" claims, Yelardy again alleges that there is no classification procedure for pretrial detainees at HRYCI.  (D.I. 2, at 11.)  Yelardy claims that his unit contains pretrial and sentenced  "rapists, murderers, mentally challenged, alcoholic, drug dependent, medicated, and homosexual inmates, ranging from teenagers, adults and senior citizens (many with a childish mentality) bunched together," which "creates high anxiety" and "leads to fights," which Yelardy has witnessed.  (Id.)  Yelardy alleges that Taylor and Williams are both responsible for the classification procedure for pretrial detainees.  (D.I. 26, at 4.)

**C.     Unreasonable Searches and Shakedowns**

The supplements and amendment to the complaint allege that Phelps is directly responsible for unwarranted intrusions into Yelardy's privacy, including "routine shakedowns" of his cell and "unwarranted strip searching." (D.I. 8, at 6; D.I. 15, at 6; D.I. 26, at 3-4.) Specifically, Yelardy alleges that on January 25, 2004 and February 3, 2004, he was placed in restraints and told to vacate his cell so that the security team could search it. (D.I. 8, at 6.) Yelardy alleges that searching his personal property every week is punitive, and that restraining him is cruel and unusual. (Id.) He further alleges that handcuffing pretrial detainees violates their due process rights, and that the day shift security team does not follow the restraining procedure during routine shakedowns. (Id.) Additionally, Yelardy alleges that Sabato put him in danger by writing an investigative report, in which he stated that Yelardy was the reason for handcuffing the detainees during the searches of their cells. (D.I. 26, at 4.)

Yelardy next alleges that he is subjected to routine strip searches upon returning from court. (D.I. 15, at 6.) Yelardy claims that the strip search procedure has no utility because he is under continuous surveillance from the time he leaves his cell until he returns, and he does not come into contact with the public when he is transported to court, while he is in the courtroom, or when he is returned to his unit. (Id.) Yelardy also alleges that "[p]lacing three men . . . in a small area, and having them strip naked beside each other, bend over and spread their buttocks, then turn around and lift their private parts, is absurd." (Id.) Finally, Yelardy alleges that the procedure is humiliating and degrading, and usually conducted in a "joking and abusive manner." (Id. at 7.)

4

### D.     No Contact Visits

Yelardy alleges that the defendants' "blanket policy" of no contact visits effectively punishes him.  (D.I. 15, at 4.)  Yelardy claims that the policy prevents him from discussing confidential matters with visitors and his attorney.  (Id.)  The complaint alleges that each inmate is allowed one 1-hour visit per week during regular business hours, with no special arrangements for out of town visitors.  (Id.)  Yelardy further alleges that the prison requires visits to be scheduled one week in advance.  (Id.)  Yelardy claims that this scheduling system is "daunting," and unconstitutionally restricts visitation.  (Id.)

### E.     Inadequate Medical Attention and Safety Concerns

Yelardy also alleges that his medical and safety needs have been ignored.  (D.I. 2, at 11.)  Yelardy's complaint documents numerous sick call slips and medical grievances he filed, regarding his request for an eye examination, between April 9, 2003 and July 30, 2003.  (Id. at 11-14.)  Yelardy alleges that he was not examined during this time because he "was not a sentenced inmate."  (Id. at 12.)  Yelardy claims that he questioned the explanation and was told that the policy was that the eye doctor would examine only a sentenced inmate.  (Id.)  Finally, on August 11, 2003, the eye doctor examined Yelardy, and prescribed eyeglasses, which he received on August 21, 2003. (Id. at 14.)  Yelardy claims that his eyes have been "irreparably damaged," as a result of waiting four months for an eye examination.  (Id. at 14.)

Yelardy also alleges that the prison has no universal precaution procedure in place to protect him from blood borne diseases.  (Id. at 15.)  According to Yelardy, physical altercations occur frequently, resulting in blood falling on floors and tables, and splashing on walls or bystanders.  (Id.)

5

Yelardy alleges that the HRYCI's staff is not trained to contain blood spills, and that an inmate's blood splashed on him during a fight, with no action taken.  (Id.)

### F.  Censorship of Reading Materials and Mail

Yelardy claims that he is arbitrarily denied access to meaningful reading materials.  (D.I. 2, at 8.)  Specifically, the complaint alleges that Yelardy was denied receipt of "The Art of War," a softback book he was sent from a bookstore.  (Id. at 9.)  Yelardy further claims that he requested a copy of the unauthorized book list, but was informed that books are reviewed for content upon arrival.  (Id.)  Yelardy also wrote to the mail room, asking why the content or subject matter of "The Art of War" is unauthorized, but received no response.  (Id.)

The complaint further alleges that the defendants have "an [un]equivocal policy of 'no internet material of any kind.'"  (Id.)  That is, Yelardy alleges that he cannot receive anything from his family that has been printed off the Internet, including legal documents, articles, letters, pictures, and the United States Constitution.  (Id.)  According to Yelardy, the restrictions are arbitrary and "effectively den[y him] access to the world library through his family and friends."  (Id.)  Additionally, Yelardy claims that the prison classifies a law dictionary as unauthorized.  (Id.)  Yelardy further claims that these policies are irrational, purposeless, and punitive.  (Id.)  Yelardy's amended complaint attributes responsibility for these policies to Phelps.  (D.I. 26, at 3.)

Moreover, Yelardy's first complaint supplement alleges that on or about the first week of November 2003, his family mailed him a copy of the complaint in this case and the mail room, without notification, forwarded it to the Warden's office, where it remained over two months.  (D.I. 8, at 2.)  The same incident occurred two more times during the months of November and December 2003.  (Id.)  On December 11, 2003, Yelardy claims that he wrote to the mail room regarding his

6

missing mail.  The mail room responded, noting that the holiday volume had caused the delay.  (Id.
at 3.)  Yelardy filed a grievance, on January 4, 2003, and appeared before the grievance chairperson
on January 20, 2003, who informed him that he would have his mail returned to him.  (Id. at 4.)  On
January 23, 2003, Yelardy received a copy of a letter written to his family members, which stated
that "offenders" could not receive legal mail, except by either copying them after submitting a law
library slip or having them mailed by the attorney, public defender, or court.  (*Id.*)  According to
Yelardy, the unwritten and unpublished legal mail policy has cause him undue hardship, anxiety, and
emotional discomfort.  (Id.)  Yelardy also claims that the policy has had a "chilling effect" on his
ability to proceed in this litigation.  (Id. at 4-5.)

     **G.**    **Inadequate Means to Litigation**

     Yelardy next claims that he continues to experience "Herculean obstacles" to his access of
the courts, which include the following: (1) he is permitted access to the law library for only one
hour and fifteen minutes per week; (2) there are only five electric typewriters in the law library, all
of which are broken; (3) the use of carbon paper is "unauthorized"; (4) copying legal papers is
unduly expensive, at twenty five cents per copy; (5) legal papers must be sent through in-house mail
to the law library; (6) there is no chain of custody for papers submitted for copying; (7) legal papers
are misplaced and sometimes lost; (8) he is not permitted to copy case law from books to take back
to his cell; (9) there is no legal mail box in his housing unit; (10) he is not permitted to have a legal
dictionary in his cell; (11) he is not permitted to have legal books "sent in" that are available in the
law library; and (12) his grievances are often lost or he receives no response to them.  (D.I. 2, at 7-8.)
Additionally, Yelardy claims that the law library is inadequate due to broken typewriters, copy
restrictions, and insufficient grievance procedures.  (Id. at 9.)  Yelardy's amended complaint alleges

that Phelps is directly responsible for the operation of the law library, as well as the issues pertaining to the law library.  (D.I. 26, at 3.)

On November 13, 2003, Yelardy filed a complaint with this court.  The defendants subsequently filed a motion to dismiss on July 13, 2004.[3]  The defendants maintain that the court should dismiss Yelardy's claims against them in their official capacities because the doctrine of sovereign immunity is a bar to official liability.  The defendants further contend that the court should dismiss the claims against them in their individual capacities because Yelardy's complaint does not allege any personal involvement by them, and because Yelardy has failed to state a claim.  Moreover, the defendants contend that the court should dismiss Yelardy's claim for injunctive relief as moot because he has been transferred from HRYCI.  Lastly, the defendants contend that Yelardy's claims must be dismissed because he has failed to allege physical injury as required by the Prison Litigation Reform Act (the "PLRA").  Yelardy filed a response, opposing the defendants' motion to dismiss. As of the date of this memorandum, no discovery has been conducted in this case.

## III.   STANDARD OF REVIEW

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz*, 1 F.3d 183 (3d Cir. 1993).  Thus, as in the case of a Rule 12(b)(1) motion, the court must accept the factual allegations of the complaint as true.  *See Graves v. Lowery*, 117 F.3d 723, 726 (3d Cir. 1997); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).  In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer."  *Colburn v. Upper Darby Tp.*, 838

_____

[3] The defendants filed further motions to dismiss on July 26, 2004 and June 21, 2005.

F.2d 663, 666 (3d Cir.1988).   In performing this task, however, the court need not "credit a

complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v.*

*Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3rd Cir.1997).   On the other hand, a court should

dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could

be proved consistent with the allegations."   *See Graves*, 117 F.3d at 726; *Nami*, 82 F.3d at 65 (both

citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Additionally, *pro se* complaints are held to "less stringent standards than formal pleadings

drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (quoting *Conley*, 355 U.S. at 45-46).

Finally, the Third Circuit has held that a district court may not dismiss a complaint with

prejudice, and must permit amendment, where a plaintiff can remedy the complaint by an

amendment, unless the amendment would be inequitable, futile, or untimely.   *See Alston v. Parker*,

363 F.3d 229, 235-36 (3d Cir. 2004).

## IV.   DISCUSSION

### A.   Sovereign Immunity

The defendants first contend that they are entitled to Eleventh Amendment immunity for

claims brought against them in their official capacities.   While unclear from the original complaint

and supplements thereto, Yelardy's amended complaint seeks to hold all of the defendants liable in

their official capacities.   The defendants, as officials of HRYCI, are state officials acting under color

of state law.   *See Cespedes v. Coughlin*, 956 F. Supp. 454, 465 (S.D.N.Y. 1997).   A suit against a

state agency or state official in his or her official capacity is treated as a suit against the state.   *See*

*Hafer v. Melo*, 502 U.S. 21, 25 (1991).  This is so because neither a state nor its officials acting in their official capacities are "persons" under § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  While a state is normally entitled to sovereign immunity, Congress may have abrogated the state's immunity through a valid exercise of its power, or the state itself may have waived its immunity.  *See Lavia v. Commonwealth of Pennsylvania*, 224 F.3d 190, 195 (3d Cir. 2000).

Neither of the two above-mentioned sovereign immunity exceptions are relevant here.  First, the state has not waived its Eleventh Amendment immunity.  A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction."  *Space Age Products, Inc. v. Gilliam*, 488 F. Supp. 775, 780 (D. Del. 1980) (citing *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)).  Such an express waiver may be made through clear constitutional or statutory language.  *See Lavia*, 224 F.3d at 195.  Neither the constitution nor any Delaware statute expressly waives Delaware's Eleventh Amendment sovereign immunity.  *See  Ospina v. Dept. of Corr.*, 749 F. Supp. 572, 579 (D. Del. 1990).  Therefore, Delaware has not clearly waived its immunity.

Finally, Congress has not abrogated the states' immunity for claims under Section 1983.  *See Quern v. Jordan*, 440 U.S. 332, 345 (1979).  Since Delaware's immunity has not been waived or abrogated, the court will dismiss Yelardy's claims against the defendants in their official capacities.

### B.        Individual Liability under 42 U.S.C. § 1983

Yelardy's amended complaint seeks to hold the defendants liable in their individual capacities.  In order to recover against the defendants individually, Yelardy must show that he was deprived of a constitutional right by a person acting under the color of state law.  *See* 42 U.S.C. §

1983.  As previously discussed, the defendants were acting under color of state law.  Thus, the only question raised by the motions to dismiss is whether the defendants' actions violated any of the plaintiff's rights.

　　　　1.　　　Conditions of Confinement Claims

Yelardy's complaint raises several challenges to the constitutionality of his conditions of confinement, including: (a) the life threatening situation caused by the mealtime incident; (b) the unhealthy living environment caused by triple-celling; (c) the lack of adequate heat in his cell; (d) the unreasonable searches and shakedowns; (e) the limits placed on his visitation rights; and (f) the inadequate medical attention and safety measures with which he was provided.  Challenges to the constitutionality of conditions of pre-trial confinement are evaluated under the Fourteenth Amendment Due Process Clause.  *Bell v. Wolfish*, 441 U.S. 520 (1979).  Under the Due Process Clause "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005) (citing *Bell*, 441 U.S. at 535).  To decide whether a pretrial detainee's constitutional rights have been violated, the court must determine whether the "disability is imposed for punishment or . . . [for] some other legitimate governmental purpose."  *Bell*, 441 U.S. at 539.  If a particular condition or restriction of pre-trial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment.  *Id.*  Moreover, "[a]bsent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'"  *Id.* at 538 (citation omitted).

11

The Third Circuit has distilled the teachings of *Bell v. Wolfish* into a two-step test: (1) whether any legitimate purposes are served by the conditions imposed; and (2) whether the conditions are rationally related to the purposes. *Hubbard v. Taylor*, 399 F.3d 150, 159 (3d Cir. 2005). Further, "[i]n assessing whether the conditions are reasonably related to the assigned purposes," the Third Circuit "inquire[s] as to whether these conditions 'cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them.'" *Id.* at 159-60 (quoting *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 992 (3d Cir. 1983)). With this inquiry in mind, the court will address Yelardy's conditions of confinement claims.[4]

    a.        Yelardy's claims relating to the mealtime incident

As previously discussed, Yelardy first claims that Medford violated his rights by ordering him to eat bread and sauce for dinner, and that Cannon violated his rights by calling a Code 3 riot when he refused to eat what he was served or "lock down" in his cell. (D.I. 2, at 5.) Applying the Third Circuit's two-part test to Yelardy's claims, the court concludes that Yelardy cannot demonstrate that Medford's and Cannon's actions confined him in such a manner so as to cause him to endure genuine privations and hardship over an extended period of time. First, insofar as Yelardy appears to claim that being ordered to eat bread and sauce for one meal on one day amounts to

---

[4] At the outset, it is worth noting that the defendants' motion to dismiss applies a flawed analysis to Yelardy's confinement claims. Although the defendants state that the Fourteenth Amendment provides the basis for Yelardy's conditions of confinement claims, they erroneously apply an Eighth Amendment analysis to those claims. *See Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005) (reversing district court for applying Eighth Amendment "cruel and unusual punishment" analysis to a pretrial detainee's conditions of confinement claim). Under the law of the Third Circuit, the court must not determine whether the conduct complained of constitutes cruel and unusual punishment, but rather, whether the conditions imposed upon Yelardy "amount to punishment prior to an adjudication of guilt in accordance with the law." *Bell*, 441 U.S. at 535.

12

punishment, the court cannot agree.  Yelardy does not allege that he was deprived of all food on a particular day, or during a particular meal.  Rather, he alleges that his meal did not contain all of the items that it should have contained.  While eating bread and sauce for one meal may not be ideal, the court is not convinced that this condition caused Yelardy to endure genuine privations and hardship over an extended period of time.

Moreover, while the defendants have not asserted any governmental interest in calling a riot after detainees sit in protest at a table, refusing follow orders, it is clear that "restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell*, 441 U.S. at 541.  In the case at bar, Cannon's actions were reasonably related to maintaining the security at HRYCI, and not excessive.  Thus, the court finds that Medford's order to eat bread and sauce, and Cannon's calling of the riot code do not amount to punishment.  Accordingly, the court will grant the defendants' motion to dismiss this claim.

> b.  Yelardy's Triple-celling Claim

Yelardy next alleges an unhealthy living environment, which includes the policy of triple-celling pretrial detainees.  Yelardy claims that due to overcrowded conditions, he is housed in a cell with two other inmates and forced to sleep on a mattress on the floor.

Applying the first step of the Third Circuit's conditions of confinement test to Yelardy's triple-celling claim, the court concludes that forcing a pretrial detainee to sleep on a mattress on the floor, in and of itself, serves a legitimate governmental purpose because overcrowding is a fact of life in prisons.  Additionally, at the core of this legitimate governmental purpose, is the need to house

inmates who cannot make bail.  *DiBuono*, 713 F.2d at 993.   Having found that the conditions imposed serve a legitimate governmental purpose, the court must now determine whether they are rationally related to the purpose, or merely for punishment.  Yelardy claims that he was forced to sleep on a mattress on the floor of his cell for over 22 months.  The Supreme Court has cautioned that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." *Bell*, 441 U.S. at 542.[5]  Here, forcing Yelardy to sleep on the floor of a 75 square foot cell that he shares with two other inmates for such a significant period may constitute punishment and, therefore, violate his due process rights as a pretrial detainee.[6]

The defendants contend that regardless of whether Yelardy has alleged facts sufficient to state a claim, he does not allege personal involvement by any of them in the decision to force him to sleep on the floor.  Thus, the defendants contend that the court should dismiss this claim because it is based on supervisory liability.  The court is not convinced.  It is true that Yelardy does not allege

[5] The Third Circuit has not had occasion to address whether forcing an inmate to sleep on the floor of his cell is a punishment and, therefore, unconstitutional.  *See id.* at 163 ("[T]he issue of the constitutionality of the placing floor mattresses adjacent to a toilet was simply not before us and we did not decide it.")  The court, however, has held that double-bunking inmates, or confining two inmates to one cell furnished with a bunk bed, passes constitutional muster because it would "avoid the unsanitary and humiliating practice of forcing detainees to sleep on mattresses placed either on the floor adjacent to the toilet and at the feet of their inmates, or elsewhere in the jail."  *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir. 1983).

[6] The present case is readily distinguishable from a recent case in this district applying the same analysis, but reaching a different conclusion.  In *Brookins v. Williams*, 402 F. Supp. 2d 508 (D. Del. 2005), the district court found that a pretrial detainee plaintiff was not punished by being forced to sleep on the floor of his cell.  *Id.* at 512-13.  However, the court took great pains to explain that it reached its conclusion based on the fact that the plaintiff was forced to sleep on the floor for only five days, *i.e.* a brief period of time.  *Id.* (distinguishing *Hubbard* because "the pretrial detainees in *Hubbard* were confined for at least two months in those conditions and, in most cases the confinement was between three to seven months.")

14

which, if any, of the defendants forced him to sleep on the floor.  However, a supervisory official can be held liable for a subordinate's constitutional tort, if that official is either the "moving force [behind] the constitutional violation" or exhibits "deliberate indifference to the plight of the person deprived." *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).  Here, Yelardy's amended complaint specifically alleges that Taylor and Williams are responsible for the triple-celling policy at HRYCI.  Given Yelardy's allegation, the court is inclined to let his claim proceed at this early stage of the litigation.

        c.     Yelardy's Lack of Adequate Heat Claim

Yelardy also alleges that his cell lacks adequate heating, and the defendants do not provide him with enough blankets to keep him warm.  Prisoners have a right under the Eighth Amendment to be free from extreme hot and cold temperatures.  *See Shelby County Jail Inmates v. Westlake*, 798 F.2d 1085, 1087 (7th Cir. 1989).  However, "the Constitution does not give inmates the right to be free from all discomfort.  The issue with regards to ventilation is the same as with all alleged constitutional violations-does the condition amount to *punishment* of pretrial detainees." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)).

In the instant case, Yelardy alleges his cell is so cold that he is in constant pain, suffering from "aching bones," for which he was prescribed medication.  He further alleges that his pain is exacerbated by the fact that he has not been able to procure enough blankets to keep him warm.  This combination of conditions potentially amounts to punishment.  *Crosby v. Georgakopoulos*, No. Civ. 03-5232(WGB), 2005 WL 1514209, at *6 (D.N.J. June 24, 2005).  However, because Yelardy has failed to allege any personal involvement by any of the defendants in connection with this deprivation, the court will dismiss this claim, without prejudice.  Additionally, the court will permit

Yelardy to amend his complaint to include allegations regarding those prison officials allegedly involved in the deprivation.

> d.      Yelardy's Unreasonable Search Claims

Yelardy's complaint supplements allege that he is subjected to routine shakedowns once a week. During the shakedowns, he is removed from his cell and placed in restraints. Yelardy alleges the shakedowns are punitive, and that placing him in restraints while the shakedowns occur is cruel and unusual. In his complaint supplement, Yelardy also alleges violations of his privacy resulting from routine strip and body cavity searches following any transportation outside the prison. According to the amended complaint, Phelps is directly responsible for these intrusions.

Recognizing that pretrial detainees retain their Fourth Amendment rights within the prison walls, the Supreme Court has held that searches of pretrial detainees in prison must be reasonable within the meaning of the Fourth Amendment. *Bell*, 441 U.S. at 539; *Newkirk v. Sheers*, 834 F. Supp. 772, 787 (E.D. Pa. 1993). The balancing test requires that courts weigh the need for the particular search against the invasion of personal rights that the search entails. *Bell*, 441 U.S. at 539. To that end, the intrusion, the manner in which the search was conducted, the justification, and the place where it was conducted are important considerations. *Id.* Moreover, blanket searches, without a reasonable and particularized suspicion, violate pretrial detainees' Due Process rights. *Id.* Ultimately, the searches must be conducted in a professional and reasonable manner. *Id.* at 560.

With respect to routine shakedowns, the Supreme Court has concluded that "[n]o one can rationally doubt that room searches represent an appropriate security measure." *Id.* at 557. Additionally, this court concludes that placing pretrial detainees in restraints during the shakedowns is an appropriate security measure, as it prevents any attempts by the detainees to frustrate the efforts

16

of those searching their cells.[7]   Because the defendants have a legitimate interest in maintaining

security in the prison facility and restraining pretrial detainees during routine cell searches furthers

that legitimate penological interest, the court concludes that the searches are not "unreasonable"

within the meaning of the Fourth Amendment.   Thus, the court will dismiss Yelardy's claim as it

pertains to the routine shakedowns and his restraint during them.

   The court, however, is concerned with Yelardy's allegations regarding the strip and cavity

searches.   Yelardy's complaint alleges that he is routinely strip searched following any outside

transportation.   Yelardy also specifically claims that the searches are demeaning, as they are

conducted in a "joking and abusive manner." (D.I. 15, at 7.)  On the one hand, the defendants have

a great interest in preventing the introduction of contraband into the prison.   On the other hand, the

humiliation and degradation that a prisoner or pretrial detainee suffers as a result of a strip and body

cavity search cannot be understated.   While the Supreme Court has held that visual body cavity

inspections can be conducted on less than probable cause, it has also cautioned that searches

conducted in an abusive fashion "cannot be condoned" because searches must be reasonable.  *Bell*,

441 U.S. at 560.   Here, the defendants do not deny Yelardy's allegations of abuse.   Moreover,

accepting Yelardy's allegations as true, the court finds that subjecting a pretrial detainee to abusive

strip and body cavity searches is unreasonable.   The court, therefore, will deny the motion to dismiss

this allegation made against Phelps.

---

[7] Indeed, assuming that the searches do not take place outside the presence of the detainees, the court can contemplate a situation in which a detainee who is not restrained during the search removes contraband from his cell, or flushes it down the toilet.  *See Bell*, 441 U.S. at 1883 (noting these concerns).

e.      Yelardy's No-contact Visitation Claim

As previously mentioned, Yelardy alleges that defendant's "blanket policy" of no contact visits effectively punishes him because it prevents him from discussing confidential matters with visitors and his attorney.   The Supreme Court squarely addressed this very issue, in *Block v. Rutherford*, 468 U.S. 576 (1984), in which it had to determine the constitutionality of a blanket prohibition on contact visits.   The Court first noted that "there is no dispute that internal security of detention facilities is a legitimate governmental interest." *Id.* at 586.   Thus, the Court's inquiry was limited to "whether [the] . . . blanket prohibition on contact visits . . . is reasonably related to the security of [the] facility." *Id.*   The Court then concluded that the blanket prohibition is "an entirely reasonable, nonpunitive response to the legitimate security concerns identified, consistent with the Fourteenth Amendment." *Id.* at 588.   In so holding, the Court reemphasized that it is "unwilling to substitute [its] judgment on these difficult and sensitive matters of institutional administration and security for that of 'the persons who are actually charged with and trained in the running' of such facilities." *Id.* at 588 (quoting *Bell*, 441 U.S. at 562.)   The Court also discussed several reasons why a blanket prohibition on contact visits furthered the governmental interest in maintaining the security of prison facilities including: the fact that visitors can easily conceal guns, weapons, drugs and other contraband; the risks to the safety of innocent individuals that exposure to detainees carries; and the fact that pretrial detainees may, in certain circumstances, present a greater risk to jail security than convicted inmates. *Id.* at 586-87.   Because *Block* squarely addresses this issue and holds that a blanket prohibition on contact visits does not amount to a constitutional violation, the court must dismiss Yelardy's claim.

    f.  Yelardy's Inadequate Medical Care Claims

  As previously discussed, Yelardy claims that his civil rights were violated due to inadequate medical care and safety measures provided by the defendants.  (D.I. 2, at 7-11.)  The complaint alleges that Yelardy suffers from "degenerative eyesight as a result of the defendants' inadequate response to his medical needs."  (Id. at 7.)  Yelardy further alleges that the HRYCI staff is not trained to contain blood spills or protect him from blood borne diseases.  The defendants do not specifically address Yelardy's medical care claims in their motion to dismiss.  The defendants generally contend, however, that Yelardy's claims must be dismissed because he has failed to allege that they were personally involved in the conduct.  (D.I. 77, at 5.)

  Pretrial detainees are to be given appropriate medical care under the Due Process Clause. *Boring v. Kozakiewicz*, 83 F.2d 468, 471 (3d Cir. 1987).  The standard of medical care required by the Due Process Clause "affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Sylvester v. City of Newark*, 120 Fed. Appx. 419, 423 (3d Cir. 2005) (not precedential) (discussing the Supreme Court's conclusion with respect to protections available to a pretrial detainee).  Under Third Circuit precedent, the court will apply an Eighth Amendment analysis when evaluating whether a pretrial detainee has sufficiently stated a claim for inadequate medical care under the Fourteenth Amendment.  *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).

  To recover for the denial of medical care under the Eighth Amendment, Yelardy must show that a prison official or employee was deliberately indifferent to his serious medical needs or acted with reckless disregard for his condition.  *See Miller v. Correctional Medical Sys., Inc.*, 802 F. Supp. 1126, 1130 (D. Del. 1992).  The deliberate indifference prong is met only if the prison official

19

"knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Rouse*, 182 F.3d at 197. The plaintiff must show a sufficiently culpable state of mind which demonstrates an unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. 294 (1991); *Rouse*, 182 F.3d at 197. Mere allegations of negligence do not meet the pleading standards for deliberate indifference. *See Estelle*, 429 U.S. at 105-106. Nor can the claim rest solely on the prisoner's dissatisfaction with the medical care he has received. *Id*. at 107.

An inmate's condition is "serious" when it is so obvious that an ordinary person would easily recognize the need for a doctor's attention or when a physician has concluded that treatment is required. *See Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir.1987). The "seriousness" prong is met also if the effect of denying or delaying care results in wanton infliction of pain or a life-long handicap or permanent loss. *Id*. In addition, the "condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury or death." *See Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir.1991).

In the present case, Yelardy alleges that he suffered permanent injury to his eyesight as a direct result of the delay in receiving medical attention. According to the complaint, prison officials and medical staff ignored numerous grievances that Yelardy filed from April 2003 through August 2003, and told him that pretrial detainees are not entitled to eye examinations. These allegations potentially amount to a constitutional violation. However, Yelardy does not allege any personal involvement by the defendants. The complaint sets forth many instances of Yelardy's

communication with prison officials or medical staff mentioned by name.[8]  However, none of those officials are named defendants in the pleadings.  Accordingly, the court will grant the defendants' motion to dismiss, without prejudice.  Further, because the court has concluded that Yelardy's claim is not futile, it will permit him to amend his complaint to add allegations against those allegedly involved with his inadequate medical care claim.

Conversely, with respect to his claims regarding the defendants' failure to contain blood spills caused by inmate fights, Yelardy has, at most, alleged that the defendants were negligent in attending to his needs when blood splashed on him during a fight.  As previously discussed, mere allegations of negligence do not meet the deliberate indifference standard.  Thus, the court will dismiss Yelardy's claim.

2.      Yelardy's Classification Claim

In addition to challenging the general conditions of his confinement, Yelardy also raises a claim based on Taylor's and Williams' policy of housing pretrial detainees with sentenced inmates, or other pretrial detainees that are being held for serious offenses.  As to this claim, the district courts in the Third Circuit have found that unless the state has an intent to punish, or displays deliberate indifference toward potential harm to an inmate, pre-trial detainees have no liberty interest in being housed separately from sentenced inmates.  *See Faulcon v. City of Philadelphia*, 18 F. Supp. 2d 537, 540 (E.D. Pa. 1998); *Chapman v. Guessford*, 924 F. Supp. 30, 33 (D. Del. 1996); *Hoover v. Watson*, 886 F. Supp. 410, 417 (D. Del. 1995), *aff'd* 74 F.2d 1226 (3d Cir. 1995).  In other words, prison officials  may not place a pretrial detainee in certain housing conditions if their intent is to punish the detainee, or if they are deliberately indifferent to the safety of the detainee in making their

_____

[8] The named prison officials and medical staff include: nurse Lia, hospital administrator Newell, Sergeant Green, Sergeant Moody, Sergeant Queener, and nurse Susan.

decision.  *See Taylor v. Plousis*, 101 F. Supp. 2d 255, 269 (D.N.J. 2000).

Here, Yelardy has not met the standard.  Yelardy has alleged no facts that would demonstrate a substantial risk to his health or safety resulting from his being housed with pretrial and sentenced "rapists, murderers, mentally challenged, alcoholic, drug dependent, medicated, and homosexual inmates."  (D.I. 2, at 11.)  At most, Yelardy has alleged that this mix of sentenced inmates and pretrial detainees leads to fights which he has witnessed.  However, he does not allege that any particular sentenced inmate or pretrial detainee has assaulted him.  Nor does he allege he was injured as a result of any of the fights.  Moreover, he does not allege that the defendants had any advanced knowledge of the fights, or that the defendants acted with deliberate indifference to the risk that he might suffer serious harm.  As such, the court will grant the defendants' motion to dismiss this claim.

3.      Yelardy's Claim Against Sabato

The amended complaint alleges that Sabato placed Yelardy's life and safety in jeopardy by authoring an investigative report, which states that Yelardy is the reason why detainees are handcuffed during routine shakedowns.  Yelardy, however, has not alleged that Sabato's statement violated any of his constitutional rights.  Nor has Yelardy alleged that Sabato's report resulted in any threat or injury to him.  In fact, Yelardy's statement is merely a bald assertion regarding Sabato's conduct.  As such, the court is not required to credit this claim.  *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3rd Cir.1997).  The court, therefore, finds that Yelardy has not sufficiently alleged that Sabato deprived him of any right, much less a constitutional right, and will dismiss this claim.

4.      Yelardy's First Amendment Claims

a.      Book Censorship

The complaint alleges that Phelps violated Yelardy's First Amendment rights by implementing

unreasonable censorship policies.  Specifically, Yelardy claims that Phelps is personally responsible

for the prohibition of certain books and Internet materials, as well as restricted access to legal

dictionaries.

A prison policy imposing on an inmate's First Amendment rights is valid if it is reasonably

related to a penological interest.  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  In *Turner*, the Supreme

Court set forth a four-part analysis in determining whether a prison policy imposes permissible

limitations on inmates' First Amendment rights.  First, the court must "assess whether there is a

'valid, rational connection' between the prison regulation and the legitimate governmental interest

put forward to justify it."  *Wolf v. Ashcroft*, 297 F.3d 305, 307 (3d Cir. 2002)  (citing *Turner*, 482

U.S. at 89).

If the court finds a legitimate and neutral interest, and a valid and rational connection, then

the analysis turns to the succeeding three prongs: whether "alternative means of exercising the right

. . . remain open to prison inmates, the impact accommodation of the asserted constitutional right

will have on guards and other inmates, and on the allocation of prison resources generally, and,

finally, whether there are 'ready alternatives' to the rule that would accommodate prisoners' rights

at [a] *de minimus* cost to penological interests." *Id.* (citation omitted).

In this case, while Yelardy's complaint alleges specific incidents of First Amendment

violations, the defendants fail to address the claims.  For instance, Yelardy claims that he was denied

access to a legal dictionary sent from a publishing company, "although the grievance committee

23

unanimously agreed it should be allowed." (D.I. 80, at 7.) This type of deprivation impinges on Yelardy's constitutional rights and, absent any justification provided by the defendants, the court will deny the motion to dismiss the claim.

      b.     Mail Censorship

Yelardy further alleges that the mail he received at HRYCI was withheld on certain occasions in November 2003 and December 2003, but eventually returned to him. According to Yelardy, this violates his First Amendment rights. Inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments. As such, prison officials may restrict an inmate's constitutional right to send and receive mail only for a legitimate penological interest. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *Turner v. Safley*, 482 U.S. 78, 89 (1987). A single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation. *Morgan v. Montayne*, 516 F.2d 1367 (2d Cir. 1975), *cert. denied*, 424 U.S. 973 (1976).

Yelardy alleges that his mail was withheld on several occasions. However, according to his complaint, he was told that holiday volume had caused the delay in receiving mail. These allegations do not demonstrate a pattern of actual and deliberate interference with Yelardy's mail. Accordingly, the court will dismiss this claim.

      5.     Yelardy's Access to the Courts Claim

Yelardy further claims that his limited access to the law library constitutes inadequate access to the courts. It is well established that prisoners retain their constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443-44 (3d Cir. 1981). However, that access is not unqualified. At least one court in this district has recognized that "prison officials of necessity must regulate the time, manner, and place in which

library facilities are used," as long as an inmate's access is not "so attenuated as to become meaningless." *Hoover v. Watson*, 886 F. Supp. 410, 419-20 (D. Del. 1994) (internal quotations omitted). Here, Yelardy alleges that he is allowed access to the law library for one hour and fifteen minutes per week. Based on this allegation alone, the court cannot conclude that his access is so attenuated as to render it "meaningless."

As previously discussed, Yelardy also alleges a constitutional violation based on the price of copies, his access to the photocopier, and his access to working typewriters. These claims, however, implicate resources that are not central to the right of access to the courts recognized and protected by *Bounds*. *Peterkin v. Jeffes*, 844 F.2d 1021, 1041 (3d Cir. 1988). As such, a cognizable claim for violation of the right to access to the courts must allege an "actual injury" as a result of the defendants' actions. *Oliver v. Fauver*, 118 F.3d 175, 177-78 (3d Cir. 1997). In the instant case, Yelardy fails to allege that he suffered any prejudice or actual injury stemming from the price of photocopies, his lack of access to the photocopier, or his lack of access to working typewriters. Thus, Yelardy has failed to show that the defendants unconstitutionally denied his right of access to the courts, and the court will dismiss this claim.

6.     Yelardy's Claims Regarding the Grievance System

While not specifically alleged in regard to any particular constitutional violation that he has claimed, Yelardy appears to raise a claim based on the inadequacy of the prison grievance system. Indeed, pervading Yelardy's complaint are allegations that he filed a grievance and never received a response, or that he did receive a response, but it was not to his satisfaction. In the Third Circuit, inmates "do not have a constitutionally protected right to the prison grievance process." *Burnside v. Moser,* 138 Fed. App'x 414, 416 (3d Cir.2005) (not precedential) (citing *Flick v. Alba*, 932 F.2d

25

728, 729 (8th Cir. 1991)).  Therefore, "'[i]f the state elects to provide a grievance mechanism, violations of its procedures do not . . . give rise to a § 1983 claim.'"  *Hoover*, 886 F. Supp. at 418-19 (quoting *Spencer v. Moore*, 638 F. supp. 315, 316 (E.D. Mo. 1986)).  Accordingly, insofar as Yelardy has alleged a claim based on the inadequacy of HRYCI's grievance system, the court will dismiss the claim.

### C.    Yelardy's Claim for Injunctive or Prospective Relief

The defendants contend that because Yelardy has been transferred from HRYCI, his claim for injunctive or prospective relief should be denied as moot.  In *Hubbard v. Taylor*, 399 F.3d 150 (3d Cir. 2005), the Third Circuit addressed this identical claim.  There, the court concluded that the plaintiffs' request for injunctive relief was not mooted by the temporary nature of a pretrial detainee's confinement because the issues it presented were "'capable of repetition, yet evading review.'"  *Hubbard*, 399 F.3d at 168 (quoting *Bell*, 441 U.S. at 527).  Applying *Hubbard* to the present case, the court will not dismiss Yelardy's request for injunctive relief because he has been transferred to the Delaware Correctional Center.

### D.    Whether 42 U.S.C. § 1997e(e) Bars Yelardy from Recovery for Alleged Constitutional Violations

The defendants' motion contends that Yelardy's complaint alleges no physical injury and, therefore, 42 U.S.C. § 1997e(e) acts as a complete bar to Yelardy's recovery for alleged constitutional violations.  Section 1997e(e) of the PLRA provides that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility for mental or emotional injuries suffered while in custody without a prior showing of physical injury."  28 U.S.C. § 1997e(e).  The Third Circuit has held that section 1997e(e)'s physical injury requirement applies only to claims for compensatory damages, because "[c]laims seeking nominal or punitive damages

26

are typically not 'for' mental or emotional injury but rather 'to vindicate constitutional rights' or 'to deter or punish egregious violations of constitutional rights,' respectively." *Mitchell v. Horn*, 318 F.3d 523, 533 (3d Cir. 2003) (quoting *Allah v. Al-Hafeez*, 226 F.3d 247, 252 (3d Cir. 2000)). Further, section 1997e(e) does not apply to claims seeking injunctive or declaratory relief. *Mitchell*, 318 F.3d at 533-34. Thus, section 1997e(e)'s "physical injury" requirement will not effect any nominal, punitive, or injunctive relief that a plaintiff has requested in his complaint.

Turning to Yelardy's complaint, the relief that he requests is two million dollars for compensatory and punitive damages, as well as injunctive relief. Specifically, Yelardy requests the court to declare that the defendants' policies, practices, acts and omissions violate his rights. Yelardy also requests the court to "issue preliminary and permanent injunctive relief to stop the unlawful acts, policies, practices and conditions." (D.I. 2, at 16.) Yelardy's complaint, therefore, requests compensatory damages, punitive damages, and injunctive relief.

With respect to Yelardy's request for compensatory damages, the court agrees with the defendants, and concludes that his complaint does not state a claim for physical injury. However, the court will grant Yelardy leave to amend his complaint in order to provide allegations with respect to any physical injuries he received. Because Yelardy need not allege a physical injury when requesting punitive damages, 42 U.S.C. § 1997e(e) does not, as the defendants contend, bar his request for punitive damages. Finally, although Yelardy has not requested nominal damages, "'it is not necessary to allege nominal damages.'" *Allah*, 226 F.3d at 251 (quoting *Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965)). Thus, at this juncture, Yelardy may recover punitive and nominal damages to vindicate his constitutional rights, as well as the injunctive relief that he requests. Accordingly, the court will grant in part and deny in part the defendants' motion to dismiss based

27

on 42 U.S.C. § 1997e(e), as well as grant Yelardy leave to amend his complaint in the manner previously discussed.


Dated: March 14, 2006                                    /s/ Gregory M. Sleet_____
                                                         UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STANLEY YELARDY,                    )
                                    )
            Plaintiff,              )
                                    )        Civil Action No. 03-1032 (GMS)
                                    )
                                    )
STANLEY TAYLOR, RAPHAEL             )
WILLIAMS, JOSEPH MEDFORD,           )
MARK CANNON,  PERRY PHELPS,         )
and JOSEPH  SABATO,                 )
                                    )
            Defendants.             )

## <u>ORDER</u>

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED that :

1.    The defendants' Motion to Dismiss for Failure to State a Claim and Motion to

      Dismiss for Lack of Jurisdiction over the Subject Matter (D.I. 76) is GRANTED

      in part and DENIED in part.

2.    The plaintiff shall be permitted to amend the complaint as directed in the court's

      Memorandum.  The amended complaint shall be filed within forty-five (45) days

      from the date of this Order.

3.    The defendants' Motion to Stay Discovery (D.I. 56) is DENIED as moot.

Dated: March 14, 2006                    /s/ Gregory M. Sleet
                                         UNITED STATES DISTRICT JUDGE