IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STANLEY YELARDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-1032-GMS |
| | ) | |
| COMMISSIONER STANLEY TAYLOR, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

## I. INTRODUCTION

The plaintiff, Stanley Yelardy ("Yelardy"), filed this *pro se* civil rights action on

November 13, 2003, pursuant to 42 U.S.C. § 1983.  At the time the complaint was filed, Yelardy

was a pre-trial detainee at the Howard R. Young Correctional Institution ("HRYCI").  He is

currently housed at the James T. Vaughn Correctional Center ("VCC").  Presently before the

court is Yelardy's motion for summary judgment directed to Delaware Department of Correction

("DOC"), former DOC Commissioner Stanley Taylor ("Taylor"), former HRYCI warden

Raphael Williams ("Williams"), and former HRYCI deputy warden Perry Phelps ("Phelps").

(D.I. 174.)  Also before the court is the motion for summary judgment of defendants Taylor, Paul

Howard ("Howard"), Williams, Mark Cannon ("Cannon"), Phelps, Joseph Sabato ("Sabato"),

Patrick Sheets ("Sheets"),  Kerry Davies ("Davies"), Gregory Defeo ("Defeo"), Quinton Gaines

("Gaines"), Douglas Rodgers ("Rodgers"), Mary Moody ("Moody"), Ann Downey-Carlton

("Downey"), Sean Dial ("Dial"), Richard Seifert ("Seifert"), Lolita Jones-N'Diaye ("Jones"),

Beatrice McClain ("McClain"), Chandar Somaru ("Somaru"), and the DOC (collectively "State

defendants").  For the reasons that follow, the court will deny Yelardy's motion for summary

judgment and will grant the State defendants' motion for summary judgment.

## II. PROCEDURAL BACKGROUND

Yelardy filed his complaint on November 12, 2003. (D.I. 2.) He has since filed several

amendments. On March 2, 2006, the court dismissed without prejudice the defendants McClain,

the Quick Response Team ("QRT"), Sheets, Correctional Officer ("C/O") Courtney Rivera

("Rivera"), and the DOC for Yelardy's failure to timely submit USM-285 forms as ordered by

the court. (D.I. 84.) A motion to reconsider this Order was denied on March 14, 2006. (D.I. 87.)

On the same date, March 14, 2006, the court ruled on the State defendants' motion to

dismiss. (D.I. 86.) The Memorandum and Order allowed Yelardy to proceed with the following

claims: triple-celling/sleeping on the floor claim, unreasonable abusive strip and body cavity

search, First Amendment book censorship, lack of adequate heat, and medical needs. The last

two claims, lack of adequate heat and medical needs were dismissed, but Yelardy was given

leave to amend the claims. He did so in his second amended complaint. (D.I. 100.) The March

14, 2006 Order also dismissed all claims against the State defendants in their official capacities;

the claims against Cannon and Sgt. J. Medford ("Medford"), now deceased; all claims relating to

the calling of a riot code and restraints; the routine search and shakedown claims; the no-contact

visitation claim; the classification claim; all claims against Sabato; the mail censorship claim; the

access to the courts claim; and the claims regarding the inadequacy of the grievance systems.

Medford, Cannon, and Sabato were not terminated from the docket due to a docketing oversight.

Yelardy filed a motion for an extension of time to comply with the Order allowing him to

amend, followed by a motion to amend the complaint. (D.I. 95, 97.) Both motions were

unopposed by the State defendants, and the court granted the motions. (D.I. 96, 98, 99.) As

mentioned, the second amended complaint realleged the lack of adequate heat and medical needs claims. It added as defendants Demetrius Green ("Green"), Martha Boston ("Boston"), Kathleen Newell ("Newell"), nurse Lia ("Lia'), Susan Mann ("Mann"), Rodgers, Moody, Downey, Dial, Howard, and Seifert. Although the court did not give Yelardy leave to do so, the second amended complaint reinstated claims and defendants previously dismissed. It may be that since Yelardy filed a motion to amend the complaint after the court had given him leave to amend the complaint, he believed he was entitled to reinstate previously dismissed claims. However, that was not the court's intent when it granted the motion to amend.

The claims properly before the court are as follows:  conditions of confinement triple-celling and sleeping on the floor; conditions of confinement excessive temperature; privacy - strip and body cavity search; censorship of reading materials; and medical needs. All other claims as set forth in the second amended complaint will be stricken as previously dismissed, pursuant to the March 14, 2006 Memorandum Opinion and Order. *(See* D.I. 86.) The claims include, but are not limited to, the claims against QRT members Davies, Jones, Defeo, Somaru, and Gaines and a related claim against Sheets; classification/housing claim against McClain, all grievance claims, and all access to the courts claims.[1]

---

[1] The court will not address Sections II and III of the State defendants' motion for summary judgment on the issues of "no claims" and "the law of the case doctrine" as it will strike all claims not properly before the court. The court notes, however, that during his deposition, Yelardy conceded that he had no valid claim against Cannon, Medford, Moody, and Sabato. (D.I. 217, A147, A151, A165.)
The second amended complaint reinstates the following claim, albeit with additional or different allegations. The original complaint discussed an occurrence wherein corrections staff called a Code 3, the prison code for a riot. (D.I. 2.) Yelardy was taken out of his cell by Sheets, handcuffed and taken by QRT members to the medical department. Plaintiff advised the medical department that he had no injuries, and Yelardy was escorted to "the hole." *(Id.)* The court found that in response to the riot code, "restraints that are reasonably related to the institution's

## III. FACTUAL BACKGROUND

Yelardy, a pretrial detainee, entered the HRYCI on March 12, 2003. (D.I. 217, A97.)  He

was housed in a cell with two other inmates, commonly referred to as triple-celling. (*Id.* at A153,

A184.) Phelps states that the HYRCI was required to house three men to a cell due to a high

pretrial detention population and state law that does not allow the DOC to turn away properly

committed individuals. (*Id.* at A184-185.) According to Phelps, housing three men to a cell

increases inmate and staff safety and gives inmates the ability to store their personal property and

use a more private, convenient bathroom. (*Id.* at A185.) Yelardy was housed in HRYCI for

almost two years, and he slept on the floor for ten months. (*Id.* at A97, A154.) During the ten

months he slept on the floor, at times, it was a little cold, he would see bugs, and was splashed

with urine from the toilet. (*Id.* at A155.) He did not, however, sustain any physical injuries.

(*Id.*) At no time did Yelardy file a grievance complaining that he was "triple-celled" or required

to sleep on the floor. (*Id.* at A155.)

---

interest in maintaining jail security do not, without more, constitute unconstitutional punishment,
even if they are discomforting and are restrictions that the detainee would not have experienced
had he been released while awaiting trial." (D.I. 86) (citations omitted). The court further found
the actions were reasonably related to maintaining the security at HRYCI, not excessive, did not
amount to punishment, and dismissed the claim.

The second amended complaint alleges that Sheets removed Yelardy from his cell and
turned him over to the QRT as a form of punishment and for training. Davis, Jones, Defeo,
Somaru, and Gaines were identified as members of the QRT. (D.I. 107.) Yelardy alleges that,
while handcuffed, the members of the QRT dragged him down a hall and down a flight of stairs
as a training exercise. The allegations attempt to allege an excessive force claim, but as
discussed Yelardy had no injuries. Moreover, as previously determined by the court, the
allegations surrounding the riot call, do not constitute unconstitutional punishment and,
therefore, fail to state a claim upon which relief may be granted. The second amended added a
new claim that Sheets' actions resulted in Yelardy's assault by a sentenced inmate. There are,
however, no allegations that Sheets knew of and disregarded an excessive risk to Yelardy's
health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994); *see also Griffin v.
DeRosa*, 153 F. App'x 851 (3d Cir. 2005).

While at the HYRCI Yelardy was housed in Cell 9 from March 18, 2004 until February 23, 2005. (*Id.* at A97). The cell was a corner cell and Yelardy was exposed to extreme temperatures, depending upon the outside weather, due to a major problem with the duct work. (*Id.* at A156-158.) Yelardy just happened to be housed in that cell. (*Id.* at A157.) Yelardy testified that according to corrections officers, there was ongoing problem with the cell temperature. He believed that maintenance supervisor Rodgers should be aware of the situation. (*Id.* at A156.) The extreme temperatures in Cell 9 lasted as long as there were extreme outside temperatures. (*Id.* at A157-158.) When it was extremely hot, corrections officers would open the cell door during count and leave it open until count was finished to release the hot air from the cell. (*Id.*) When it was extremely hot, it was extremely uncomfortable, but it did not cause Yelardy any physical problems. (*Id.* at 158) When it was extremely cold, Yelardy was given an extra blanket. (*Id.* at A156.) Yelardy testified that the cold caused extreme discomfort and that he could not function. (*Id.* at A158.) The record reflects that Yelardy filed two grievances regarding the cold temperature in his cell, but none for excessive heat. (*Id.* at A123-132.) He believes that Taylor, Williams, and Rodgers were responsible for correcting the cell temperature problem. (*Id.* at A156-57.)

Prior to his incarceration Yelardy wore reading glasses, but he did not have them with him when he entered the HRYCI. (*Id.* at A160.) On March 18, 2003, Yelardy submitted a request to Williams asking for "authorization to receive reading glasses from home." (D.I. 218, A99.) Yelardy was informed that he could receive eye glasses only if they were mailed by his eye care professional." (*Id.*) On April 2, 2003, Yelardy submitted a sick call slip requesting glasses and was scheduled to see a nurse. (*Id.* at A100.) On May 11, 2003, he resubmitted the

medical grievance and asked for permission to receive his eye glasses from home. (*Id.* at A101.) The response indicates that Yelardy was on schedule to see the eye doctor but could obtain glasses from his private eye doctor. (*Id.*)

Yelardy wrote to Warden Williams again stating that he is "trying to get reading glasses" and indicating that he was called to sick call and placed on the list to see the eye doctor. (*Id.* at A103.) He asked Williams to authorize his family to send a pair of plastic reading glasses while he waited to see the eye doctor. (*Id.*) Once again, Yelardy was advised that prescription eyewear must be mailed from his eye care professional. (*Id.*) On June 30, 2003, Yelardy submitted yet another medical grievance and stated that he was told he would be put on the list to see the eye doctor, but that Green had spoken to medical and was told Yelardy could not see a physician because he was not sentenced. (*Id.* at A104.) Yelardy asked to see an eye doctor as soon as possible. (*Id.*) The response, dated August 21, 2003, states that Yelardy had seen the doctor and received his glasses. (*Id.*) During his deposition, Yelardy testified that he knew he could only obtain glasses from outside the prison from an eye care professional and that he was scheduled to see an eye doctor. (D.I. 217, A164.)

Every time Yelardy appeared in court, upon his return to the HRYCI, he was stripped searched. (*Id.* at A166.) HYRCI policy requires the strip search of all incarcerated individuals when they have been to, or are returning from, any place where they may have had contact with the public. (*Id.* at A185.) "The purpose of this policy is to ensure the safety and security of the institution, as well as the HRYCI staff." (*Id.*) Yelardy describes the search as follows: the inmate is taken by an officer into a private shower area, is told to "strip, bend over, spread your cheeks, squat [and] cough." (*Id.* at A166.)

Yelardy testified that at times during the strip searches he heard inmates and officers laughing together and making jokes about the search. (*Id.* at A167-168.) The comments were not to Yelardy, but to other inmates. (*Id.* at A168.) Yelardy also overheard officers make comments about an alleged homosexual corrections officer. (*Id.* at A168.) This officer, however, made no sexual advances towards Yelardy and always conducted himself in a professional manner. (*Id.* at A168-169.)

While housed at the HRYCI, Yelardy was not allowed to receive or possess certain publications. Yelardy was denied *The Art of War* as unauthorized; *Philadelphia Black Mafia* as mafia related; *Forty-Eight Laws of Power* as have been returned in the past; *When the Wind Blows* due to violent nature of material; *E.A.R.L.* for violent content and glorifying drugs; a family photo as showing an alcohol beverage in the photo; internet materials because internet material of any kind is not authorized; *Black's Law Dictionary* as available in the library; *XXL* magazine as unauthorized; and *Source* as unauthorized.[2] (*Id.* at A107, A171; D.I. 158.) However, Yelardy was able to receive and read other materials while at HRYCI. (*Id.* at A173.)

The HYRCI policy at that time provided that inmates were permitted to have in their cell a maximum combination of five books and/or magazines as well as two newspapers. (*Id.* at A186.) "Inmates were not permitted to have publications that explain the construction of weapons; advocate or provide instructions for escape or riot; jeopardize the security or safety of offenders and staff; depict sexually explicit material; or advocate racial discrimination." (*Id.*) The purpose of the ban on violent and sexually explicit materials is to protect the safety and

---

[2]Yelardy was not allowed to have *Black's Law Dictionary* since it was available at the law library. This allegation relates to his access to the courts claim, previously dismissed. (*See* D.I. 86.)

security of the inmates and staff at HRYCI. (*Id.*)

## IV. DISCUSSION

### A. Standard of Review

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the

burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Yelardy moves for summary judgment on the grounds that no reasonable jury could find that a custom of triple-celling and floor-sleeping did not exist at the HRYCI during time that he was housed there as a pretrial detainee. The State defendants move for summary judgment on the grounds that the DOC is immune from suit; there are no claims against Cannon, Medford, Moody, and Sabato; the law of the case doctrine precludes reconsideration of certain claims; Yelardy failed to exhaust his administrative remedies as to certain claims, and in any event his constitutional rights were not violated; the cell temperature was not violative of Yelardy's constitutional rights; the facts do not establish deliberate indifference to Yelardy's medical needs; the censorship claim is moot and Yelardy's First Amendment rights were not violated; and the State defendants have qualified immunity.

Yelardy argues that the State defendants' motion is untimely, they failed to respond to his motion for summary judgment in any meaningful way, exhaustion attached to previous litigation, and the State defendants have failed to honor previous settlement agreements. (D.I. 219.) Yelardy only addresses the triple-celling/sleeping floor claim, and did not respond to the other issues raised by the State defendants in their motion for summary judgment. Attached to Yelardy's response is a request for production of documents directed to State defendants seeking all documents provided to the plaintiff in *Poole v. Taylor*, 466 F. Supp. 2d 578 (2006).[3]

---

[3]*Poole v. Taylor* raised conditions of confinement claims of triple-celling and being forced to sleep on a mattress on the floor in various locations at Gander Hill (i.e. HYRCI). *Poole v. Taylor*, No. 07-1473 (3d Cir. Oct. 30, 2008).

## B. Eleventh Amendment Immunity

The court dismissed the DOC as a defendant and Yelardy reinstated it using the name DOC Policymaking Authority.  Regardless, the Eleventh Amendment of the United States Constitution protects an unconsenting state or state agency from a suit brought in federal court by one of its own citizens, regardless of the relief sought.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); *Edelman v. Jordan*, 415 U.S. 651 (1974).  The State has not waived its immunity from suit in federal court, and although Congress can abrogate a state's sovereign immunity, it did not do so through the enactment of 42 U.S.C. § 1983.  *Brooks-McCollum v. Delaware*, 213 F.  A'ppx  92, 94 (3d Cir. 2007) (citations omitted)(not precedential).  Similarly, the Eleventh Amendment also prevents this court from granting Yelardy's request for prospective injunctive relief against the DOC.  *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146 (1993) (noting inapplicability of *Ex Parte Young* exception to state agencies); *see also Walker v. Beard,* 244 F. App'x 439, 440 (3d Cir. 2007) (not precedential).  For the above reasons, the court will grant the DOC summary judgment.

## C. Exhaustion

The State defendants move for summary judgment on the triple-celling/sleeping on floor and strip search claims on the basis that Yelardy did not exhaust his administrative remedies prior to filing suit.  Yelardy argues that he did not think that he needed to file a grievance on the triple-celling/sleeping on the floor issues because they are non-grievable.  Yelardy did not provide evidence to support this position.  He also asserts that the issue has been presented to the State defendants before, if not by him, then by other pretrial detainees.  Yelardy references *Poole*

*v. Taylor*, 466 Fed. Supp. 2d 578, 583 (D. Del. 2006) in support of his position that other pretrial detainees previously presented the issue to the State defendants.[4]  He did not respond to exhaustion relative to his strip search claim.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Failure to exhaust administrative remedies must be pled and proved by the defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88. The PLRA does not require the grievance and complaint to be identical because inmates are required to complete the applicable administrative process (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. *See Booth v. Churner*, 532 U.S. 731 (2001).

"'[P]rison grievance procedures supply the yardstick' for determining what steps are

---

[4]*See* n.3, *supra.*

required for exhaustion." *Williams v. Beard,* 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill v. Gillis,* 372 F.3d 218, 231 (3d Cir. 2004)).  Third Circuit case law makes clear that a prisoner must complete the administrative review process in accordance with the applicable procedural rules in order to satisfy the exhaustion requirement of the PLRA.  *Nickens v. Department of Corr.,* 277 F. App'x 148, 152 (3d Cir. 2008) (not precedential) (citing *Williams,* 482 F.3d at 639; *Spruill,* 372 F.3d at 228, 231.)  DOC administrative procedures provide for a multi-tiered grievance and appeal process.  DOC Policy 4.4 (revised May 15, 1998).  First, the prisoner must file a grievance within seven days with the Inmate Grievance Chair, for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Grievance Resolution Committee for a determination, which is forwarded in turn to the Warden; and third, the Bureau Grievance Officer conducts the final level of review.  *Id.*

It is clear from Yelardy's testimony and the record that he failed to demonstrate exhaustion of the triple-celling/sleeping on floor and strip search claims.  Yelardy's failure to properly exhaust is fatal to his claims.  "[I]t is beyond the power of this court . . . to excuse compliance with the exhaustion requirement." *Nyhuis v. Reno,* 204 F.3d 65, 73 (3d Cir. 2000).  Accordingly, the court will grant the State defendants' motion for summary judgment as to the triple/celling sleeping on floor and strip search claims on the basis of failure to exhaust administrative remedies.[5]

---

[5]The court will not address the merits of the triple-celling/sleeping on floor and strip search claim as Yelardy failed to exhaust his administrative remedies.  The facts in this case, however, are strikingly similar to two recent cases decided by the United States Court of Appeals for the Third Circuit, both of which addressed the issues of triple-celling and sleeping on the floor.  In *Poole v. Taylor,* the Third Circuit held that the conditions of confinement claim raising issues of triple-celling and being forced to sleep on a mattress on the floor in various locations of Gander Hill (i.e. HYRCI) could not succeed because in a factually analogous case, *Hubbard v.*

## D. Conditions of Confinement

Yelardy alleges that he was exposed to excessive heat and cold while housed in cell 9. The second amended complaint adds that Sheets, Green, and maintenance supervisor Rodgers were aware of the extreme cell temperatures. The State defendants move for summary judgment on this issue on two grounds. First, that Yelardy failed to identify a specific supervisory practice or procedure that the supervisory officials failed to employ and knew Yelardy was at risk of harm and disregarded that risk. Second, that Yelardy cannot establish that he was placed in a cell with extreme temperatures for the purposes of punishment or that the extreme temperatures created a genuine hardship over an extended period of time.

The *Bell v. Wolfish*, 441 U.S. 520 (1979) standard requires courts to consider whether conditions endured by pretrial detainees amount to punishment, whether they are reasonably related to a legitimate purpose, and whether they are excessive in relation to that purpose. *Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005). The Third Circuit has distilled the teachings of *Bell v. Wolfish* into a two-step test: (1) whether any legitimate purposes are served by the conditions imposed; and (2) whether the conditions are rationally related to the purposes.

---

*Taylor,* it held that "Defendants did not violate Plaintiffs' constitutional rights." *Poole v. Taylor*, No. 07-1473 (3d Cir. Oct. 30, 2008); *see Hubbard v. Taylor*, 538 F.3d 229, 238 (3d Cir. 2008). *Hubbard*, decided August 5, 2008, holds that, based on the totality of the circumstances presented on the factual record, triple-celling of pretrial detainees was rationally related to prison officials' legitimate governmental interest; requiring pretrial detainees to sleep on a mattress on the floor of their cells for a period of three to seven months did not violate the detainees' Fourteenth Amendment due process rights; and even if pretrial detainees' due process constitutional rights were violated by requiring them to sleep on mattresses on the floor, the law was not sufficiently clear so that a reasonable official would understand that what he was doing violated a constitutional right. In light of *Poole v. Taylor* and *Hubbard v. Taylor*, and the facts of this case, a reasonable jury could not find that Yelardy's consititutional rights were violated when he was triple-celled and required to sleep on the floor.

*Hubbard v. Taylor*, 399 F.3d at 159. "In assessing whether the conditions are reasonably related to the assigned purposes," the Third Circuit "inquire[s] as to whether these conditions 'cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them.'" *Id.* at 159-60 (quoting *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 992 (3d Cir. 1983) (internal quotations omitted). Only the conditions of confinement provided "in such a manner as to cause [detainees] to endure genuine privation and hardship over an extended period of time " raises a due process concern. *Bell v. Wolfish,* 441 U.S. at 542.

Yelardy testified that he just happened to be housed in a cell with temperature problems, and that he believed that the cell temperature problems were due to the duct work. Yelardy was not required to endure the excessive temperatures for an extended period of time. He was housed in cell 9 for almost a year, but exposed to excessive heat and cold only when there were excessive temperatures outside. Moreover, corrections officials provided him with extra blankets when it was cold and, when it was hot, left the door open in his cell to circulate the air. Yelardy provided no evidence that he was assigned to Cell 9 for the purpose of punishment, and a reasonable jury could not find that Yelardy's intermittent exposure to extreme hot and cold caused him any privation and hardship. Therefore, the court will grant the State defendants' motion for summary judgment on the conditions of confinement extreme temperature claim.

**E.  Medical Needs**

The second amended complaint alleges that the defendants were deliberately indifferent to Yelardy's medical needs, particularly with regard to the delay or denial in obtaining reading glasses. Yelardy alleges that Williams, Green, Boston, Newell, Liz, and Mann are culpable for

violating his constitutional rights.[6] The State defendants contend that summary judgment is appropriate as the facts demonstrate that, rather than ignore Yelardy's plight, Williams responded to his medical requests.

Courts have concluded that the Fourteenth Amendment affords pretrial detainees protections that are "at least as great as the Eighth Amendment protections afforded to a convicted prisoner." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Hence, when assessing medical claims by pretrial detainees, courts may apply the deliberate indifference standard established under the Eighth Amendment but must view the inquiry in the context of the *Bell v. Wolfish* standard, which applies Fourteenth Amendment due process principles and not the cruel and unusual punishment standard to pretrial detainees. *See Hubbard*, 399 F.3d at 165-66. The deliberate indifference standard requires a finding of a serious medical need and acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582.

The record reflects that Yelardy received a response each time he submitted a grievance or a request medical services. He was told time and time again that, if he wished to received glasses from outside the HRYCI, they must be sent by his medical provider. Any delay in his receiving eyeglasses may be attributable to his repeated requests to grant him permission to receive his glasses from home, despite prison regulations prohibiting the same. Moreover, Yelardy was schedule to see a nurse and an eye doctor, ultimately saw the eye doctor, and

---

[6]Green, Newell, and Lia have not been served. Boston's and Mann's attorney was recently allowed to withdraw from the case. They are not parties to the State defendants' motion for summary judgment.

received his glasses.  Based upon the foregoing, a reasonable jury could not find that Williams was deliberately indifferent to Yelardy's medical needs.  Accordingly, the court will grant the State defendants' motion for summary judgment on the medical needs issue.

### F. Censorship

Yelardy alleges that the State defendants arbitrarily denied him access to meaningful reading materials.  The State defendants argue that since Yelardy is no longer housed at the HYRCI, his request that he have access to the books is moot.  They further argue that the *Turner* factors have been met and they did not violate Yelardy's First Amendment rights.  Yelardy did not respond to the motion.

A prison policy imposing on an inmate's First Amendment rights is valid if it is reasonably related to a penological interest.  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  A four-part analysis is used to determine whether a prison policy imposes permissible limitations on inmates' First Amendment rights.  First, the court must "assess whether there is a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."  *Wolf v. Ashcroft*, 297 F.3d 305, 307 (3d Cir. 2002) (citing *Turner*, 482 U.S. at 89).  If the court finds a legitimate and neutral interest, and a valid and rational connection, then the analysis turns to the succeeding three prongs: whether "alternative means of exercising the right . . . remain open to prison inmates, the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and, finally, whether there are 'ready alternatives' to the rule that would accommodate prisoners' rights at [a] *de minimus* cost to penological interests."  *Id.* (citation omitted).

As to the first factor, the State defendants argue that the publications were denied because

either their violent nature and/or sexually explicit content posed a threat to the safety and security of HYRCI or the material was available in the law library.[7] Courts have held that security and rehabilitation concerns are legitimate penological interests. *See Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989); *Turner,* 482 U.S. at 91-92. The court concludes, therefore, that the security and rehabilitative goals advanced by the State defendants are legitimate penological interests. While censorship of materials containing violent and sexually explicit content is certainly not content-neutral in a First Amendment sense, it appears neutral and for the legitimate purpose of security and rehabilitation.

The second prong of the *Turner* test is whether the prisoners have alternative means of expression. *See* Turner, 482 U.S. at 92. Whether there are other means of expression should be viewed "sensibly and expansively." *See Thornburgh*, 490 U.S. at 417. Yelardy testified that he had access to other publications during the time he was housed at the HYRCI. Therefore, the court concludes that the policy satisfies the second prong of the *Turner* test.

The court must also consider possible "ripple effect[s]" when analyzing the impact that accommodation of the right would have on third parties such as prison guards and other inmates, *Turner*, 482 U.S. at 92. The State defendants indicate that the purpose of the ban on violent and sexually explicit materials is to protect the safety and security of the institution. The banned materials may contribute to unacceptable and dangerous behaviors amongst the inmate population. Authorizing receipt of materials by some prisoners yet prohibiting receipt by others on an individualized basis would not solve the "ripple effect" problem and would come at the

---

[7]The court concluded in its March 14, 2006 order that the State defendants were justified in denying Yelardy access to legal works since they are available in the prison law library. (D.I. 86.)

high cost of significantly less liberty and safety for prison guards and other prisoners. *See id.*

Accordingly, the court concludes that the policy satisfies the third prong of the *Turner* test.

The last prong requires Yelardy to meet his burden to prove that an adequate alternative

of reaching the prison's objective exists. *See Mauro,* 188 F.3d at 1062. Yelardy did not respond

to this portion of the motion for summary judgment. Because Yelardy has failed to demonstrate

an adequate alternative, the court will grant the State defendants' motion for summary judgment

as to the First Amendment censorship claim.[8]

## V. CONCLUSION

For the above stated reasons the court will grant the defendants' motion for summary

judgment and will deny the plaintiff's motion for summary judgment. An appropriate order will

be entered.

CHIEF, UNITED STATES DISTRICT JUDGE

_____, 2009
Wilmington, Delaware

---

[8]The court will not address the issue of qualified immunity since it is granting the State defendants' motion on other grounds.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STANLEY YELARDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civil Action No. 03-1032-GMS | |
| | ) | |
| COMMISSIONER STANLEY TAYLOR, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington this _11th_ day of ___Feb.___, 2009, for the reasons set forth in the Memorandum issued this date;

1. The clerk of the court is directed to **terminate** the defendants Sgt. J. Medford, C/O Mark Cannon, and Lt. Joseph Sabato from the court docket as the claims against them were dismissed in the March 14, 2006 Memorandum Opinion and Order. (D.I. 86.)

2. The proper claims before the court are (1) conditions of confinement triple-celling and sleeping on the floor; (2) conditions of confinement excessive temperature; (3) privacy - strip and body cavity search; (4) censorship of reading materials; and (5) medical needs. All other claims as set forth in the second amended complaint are **stricken** as previously dismissed, pursuant to the March 14, 2006 Memorandum Opinion and Order. (D.I. 86.)

3. The plaintiff's motion for summary judgment is **denied**. (D.I. 174.)

4. The State defendants' motion for summary judgment is **granted**. (D.I. 215.)

5. At the close of the case, the clerk of the court is directed to enter judgment in favor of

the State defendants as set forth in the Memorandum issued this date.

      6. Only the medical needs claim remains against the defendants Demetrius Green,

Martha Boston, Kathleen Newell, Nurse Lia, and Susan Mann.

CHIEF, UNITED STATES DISTRICT JUDGE