IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STANLEY YELARDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-1032-GMS |
| | ) | |
| SGT. DEMETRIUS GREEN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

## I. INTRODUCTION

The plaintiff, Stanley Yelardy ("Yelardy"), filed this *pro se* civil rights action on

November 13, 2003, pursuant to 42 U.S.C. § 1983.[1]  At the time the complaint was filed, Yelardy

was a pre-trial detainee at the Howard R. Young Correctional Institution ("HRYCI"),

Wilmington, Delaware.  He is currently housed at the James T. Vaughn Correctional Center

("VCC"), Smyrna, Delaware.  Presently before the court is Yelardy's request for counsel, motion

for extension of time, and affidavit in support of default judgment and the defendant, Martha

Boston's ("Boston") motion for summary judgment.  (D.I. 249, 250, 256, 258.)  For the reasons

that follow, the court will deny Yelardy's request for counsel, deny as moot the motion for

extension of time, deny the request for default judgment, will grant Boston's motion for summary

judgment, and dismiss without prejudice the defendants nurse Susan Mann ("Mann") and

Sergeant Demetrius Green ("Green").

---

[1]When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him
of a federal right, and that the person who caused the deprivation acted under color of state law.
*West v. Atkins,* 487 U.S. 42, 48 (1988).

## II. PROCEDURAL BACKGROUND

Yelardy filed his complaint on November 12, 2003. (D.I. 2.) He has since filed several amendments, and the case now proceeds on the second amended complaint. (D.I. 100.) Only medical needs claims remain against the defendants Green, Boston, and Mann. All other defendants have either been dismissed or granted summary judgment.[2] (D.I. 43, 84, 224, 247.)

Yelardy alleges that the defendants were aware of unconstitutional conditions of confinement at the HYRCI and there was common knowledge of violence and sexual assault by sentenced inmates. (D.I. 100.) He alleges that as a pre-trial detainee, on an unidentified date, he was physically assaulted by a sentenced inmate, and believes that he contracted Hepatitis C from that inmate. (*Id.* at 3.) He further alleges that the defendants failed to take corrective action in response to the high rates of assaults on pre-trial detainees and patterns of assault. (*Id.*)

With regard to Boston, the mental health chief, Yelardy specifically alleges that: (1) he complained to her via correspondence and an interview with department staff about the physical and mental abuse by the sentenced inmate, but she took no action; (2) Boston was indifferent to his needs and he is now on chronic care for Hepatitis C; (3) had Boston been vigilant, the disease would have been detected earlier; and (4) Boston provided no mental relief to him "during the two years of eighteen hours of lockdown, each day as a pre-trial detainee." (*Id.* at 6-7.) With regard to Mann, the amended complaint alleges that she had Yelardy sign an informal resolution assuring him he would see an eye doctor on July 28, 2003, that the doctor arrived on that date but Yelardy was not allowed to see him, and that Mann's medical attention was inadequate. (*Id.* at 9.)

---

[2]Green has not been served.  Boston is represented by counsel and Mann proceeds *pro se.*

## III. FACTUAL BACKGROUND

Yelardy, as a pretrial detainee, entered the HRYCI on March 12, 2003, and was housed there for almost two years. (D.I. 217, A97, A154.) Yelardy shared a cell with two other inmates, commonly referred to as triple-celling. (*Id.* at A153, A184.)

Boston, a licensed psychologist, was employed by First Correctional Medical-Delaware ("FCM") from August 12, 2002 until March 4, 2005. During her employ she was the chief psychologist. FCM contracted with the Delaware Department of Correction ("DOC") to provide psychological services to prison inmates. Boston has training regarding physical and/or sexual abuse. While employed by FCM, she attended security training programs wherein all staff members were instructed to report inmate claims of abuse to the security staff and, when inmates made abuse claims to her, she reported the claim to the proper authorities in the prison system. Boston's duties included organizing mental health treatment groups for sentenced inmates, attending treatment team meetings, and conducting mental health evaluations upon the DOC's request, but they did not authorize her to investigate issues of prison abuse. Nor did her duties include screening, diagnosing or treating inmates with Hepatitis C. (D.I. 256, Boston aff.) Boston did not personally receive a verbal or written complaint from Yelardy that he was being abused. There is no indication in Yelardy's medical records there was contact between Boston and Yelardy.

The mental health department performs intake screening on all incoming inmates. Yelardy's intake examination was conducted by a registered nurse on March 12, 2003. He

provided a history of drug abuse, but no history of mental illness.[3]  During a March 18, 2003

examination, Yelardy did not report any mental health issues.  A mental health examination

performed by a mental health clinician on March 26, 2003, and reviewed by Boston on April 9,

2003, reveals that Yelardy did not provide a history of mental health treatment or psychiatric

hospitalization.[4]  His mental records contain only one sick call slip to the mental health unit,

dated June 26, 2003.  Yelardy complained of physical and mental abuse during a five-day

detention with no further detail, except a lack of response by the prison staff.  (*Id.*)

Yelardy was seen on July 3, 2003, in response to the request.  The July 3, 2003 record

does not indicate that he reported any type of abuse to the mental health worker during the

evaluation.  On August 5, 2003, Yelardy was examined by a psychiatrist, Dr. Joshi, as a follow-

up to the July 3, 2003 evaluation.  Dr. Joshi offered Yelardy anger management materials upon

request, but Yelardy did not make further requests or submit subsequent sick call slips seeking

mental health treatment.  (*Id.*)

Prior to his incarceration Yelardy wore reading glasses, but he did not have them with

him when he entered the HRYCI, and on March 18, 2003, he submitted a request for

"authorization to receive reading glasses from home." (D.I. 217, A160; D.I. 218, A99.)  Yelardy

was informed that he could receive eye glasses only if they were mailed by his eye care

professional." (D.I. 218, A99.)  On April 2, 2003, Yelardy submitted a sick call slip requesting

glasses and was scheduled to see a nurse.  (*Id.* at A100.)  On May 11, 2003, he resubmitted the

[3]Yelardy's drug use included intravenous drug use, a common means of contracting
Hepatitis C.  (D.I. 256, Boston aff.)

[4]Yelardy expressed concern should his mother die during his incarceration.  (D.I. 256, ex.
D.)

-4-

medical grievance and asked for permission to receive his eye glasses from home. (*Id.* at A101.) The response indicates that Yelardy was on the schedule to see the eye doctor but could obtain glasses from his private eye doctor. (*Id.*)

Yelardy wrote to the warden indicating that he was "trying to get reading glasses," was called to sick call, and placed on the list to see the eye doctor. (*Id.* at A103.) He asked for authorization for his family to send a pair of plastic reading glasses while he waited to see the eye doctor. (*Id.*) Once again, Yelardy was advised that prescription eyewear must be mailed from an eye care professional. (*Id.*) On June 30, 2003, Yelardy submitted another medical grievance and was told he would be placed on the list to see the eye doctor, but Green, who had spoken to medical, was told Yelardy could not see a physician because he was not sentenced.[5] (*Id.* at A104.) At that point, Mann became involved and called Yelardy out for an informal resolution of the grievance. (D.I. 217, A161.) Mann advised Yelardy that she would see he saw an eye doctor, she left, and he saw an eye doctor shortly thereafter. (*Id.*) Yelardy testified that he included Mann as a defendant because it "took too long" "although she actually resolved the problem." (D.I. 217, A162.)

As of August 21, 2003, Yelardy had seen a doctor and received his glasses. (*Id.* at A162, A165.) He was without his reading glasses from March until August. (*Id.* at A165.) His injuries included eye strain, a few headaches, and perhaps a worsening of his vision, but no one told him that his vision was severely damaged. (*Id.* at A164, A181.)

---

[5]Yelardy was later told by a correctional officer that Green provided incorrect information. (D.I. 217, A160.)

## IV.  DISCUSSION

### A.  Request for Counsel

Yelardy requests counsel on the grounds that he does not have the capacity to conduct the

necessary research and prepare documentation to withstand the rigors of civil litigation; the

litigation has been ongoing for several years and the court has granted several motions to dismiss

filed by the defendants; he has not ben afforded an equal opportunity to present his claims;

discovery responses have been damaging to an effective presentation of claims and he has been

denied discovery that would support his claims; he should not be held accountable for acts that

are beyond his control; and he was denied the opportunity to amend his complaint even though it

was warranted.  (D.I. 249.)  Although a plaintiff does not have a constitutional or statutory right

to an attorney,[6] a district court may seek legal representation by counsel for a plaintiff who

demonstrates "special circumstances indicating the likelihood of substantial prejudice to [the

plaintiff] resulting . . . from [the plaintiff's] probable inability without such assistance to present

the facts and legal issues to the court in a complex but arguably meritorious case."  *Tabron v.*

*Grace*, 6 F.3d 147, 154 (3d Cir. 1993)(citing *Smith-Bey v. Petsock*, 741 F.2d 22, 26 (3d Cir.

1984)).

Factors to be considered by a court in deciding whether to request a lawyer to represent an

indigent plaintiff include: (1) the merits of the plaintiff's claim; (2) the plaintiff's ability to

present his or her case considering his or her education, literacy, experience, and the restraints

---

[6]*See Mallard v. United States Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989) (§ 1915(d) (now § 1915(e)(1)) does not authorize a federal court to require an unwilling attorney to represent an indigent civil litigant, the operative word in the statute being "request."; *Tabron v. Grace*, 6 F.3d 147, 153 (3d Cir. 1993) (no right to counsel in a civil suit).

placed upon him or her by incarceration; (3) the complexity of the legal issues; (4) the degree to

which factual investigation is required and the plaintiff's ability to pursue such investigation; (5)

the plaintiff's capacity to retain counsel on his or her own behalf; and (5) the degree to which the

case turns on credibility determinations or expert testimony. *Montgomery v. Pinchak*, 294 F.3d

492, 498-99 (3d Cir. 2002); *Tabron*, 6 F.3d at 155-56.

　　　Yelardy's filings in this case demonstrate his ability to articulate his claims and represent

himself. Moreover, as will be discussed, this Memorandum resolves all pending issues in favor

of the defendants. Thus, in these circumstances, the court will deny Yelardy's request for

counsel. (D.I. 249.)

### B. Summary Judgment

#### 1. Standard of Review

　　　The court shall grant summary judgment only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine

issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the

court must view the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

If the moving party has demonstrated an absence of material fact, the nonmoving party then

"must come forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587 (quoting Fed. R. Civ. P.

56(e)). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Boston moves for summary judgment on the grounds that Yelardy failed to establish a § 1983 violation and collateral estoppel precludes his claims regarding housing conditions. (D.I. 257.) Yelardy contends that this matter is not ripe for summary judgment, he is disadvantaged because he proceeds *pro se* and Boston is represented by counsel, and the record indicates that, as a pre-trial detainee, Boston did not provide him adequate mental health services.[7]

## 2. Personal Involvement/Respondeat Superior

Boston argues that the claims against her fail because the facts do not demonstrate her personal involvement in the deprivation of Yelardy's rights through inadequate medical care. "A defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be

---

[7]Yelardy filed a motion for an extension of time to respond to Boston's motion for summary judgment. (D.I. 258.) The court will consider Yelardy's belatedly filed opposition to the motion for summary judgment and, therefore, will deny as moot the motion for an extension of time.

liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (internal citations omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Additionally, it is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory.[8] *See Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937 (2009); *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 69 n.14 (3d Cir. 1993). Purpose rather than knowledge is required to impose liability on an official charged with violations arising from his or her superintendent responsibilities.[9] *Iqbal*, 129 S.Ct. at 1949. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* Instead, a plaintiff must show that an official's conduct caused the deprivation of a federally protected right. *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

---

[8]In *Iqbal*, the plaintiff alleged supervisory officials violated his rights because one official was the "principal architect" of the policy, and another was "implemental" in adoption and execution of the policy. *See id.* at 1944. The Supreme Court found the allegations facially insufficient. *See Iqbal*, 129 S.Ct. at 1949 (quoting *Robertson v. Sichel,* 127 U.S. 507, 515-516 (1888), for the proposition that "[a] public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties").

[9]In light of *Iqbal*, it is uncertain whether proof of personal knowledge, with nothing more, provides a sufficient basis to impose liability upon a supervisory official. *See Bayer v. Monroe County Children and Youth Services*, 577 F.3d 186, 190 n.5 (3d Cir. 2009).

Yelardy interprets Boston's affidavit as suggesting that her duties did not extend to pre-trial detainees, but only to sentenced inmates and mental evaluations as requested by the DOC, thus supporting his position that pre-trial detainees were not given mental health care. He argues that Boston did not have mental health policies specifically designed to provide services to pre-trial detainees at the HYRCI.[10] Yelardy contends that the comprehensive mental health evaluation form clearly reveals his mental health needs, but there was no follow-up. He argues, without supporting evidence, that when Boston reviewed his mental health evaluation on April 9, 2003, he was being physically abused following an April 7, 2003 transfer to segregation. It is Yelardy's position that, as a pre-trial detainee housed with sentenced inmates and three men to a cell, Boston exhibited deliberate indifference by her failure to address in any significant way the potential physical and mental risk of harm to him.

Yelardy argues, without supporting evidence, that Boston was responsible for the untrained person who interviewed him in reference to his sick call request (i.e., Teresa E. DeMarco ("DeMarco")) who was not qualified to assess his needs. He contends that he explained to DeMarco the physical and mental abuse he received at the hands of a sentenced inmate and that DeMarco gave him the impression a confidential report/investigation would ensue, but she was not qualified or trained to recognize and respond to his allegations of inmate abuse. Yelardy states that the physical and mental abuse expressed to DeMarco were not discussed during the follow-up session with Dr. Joshi.

---

[10]Yelardy states, without supporting evidence states that Boston's employment was terminated for failure to provide adequate mental health services to pre-trial detainees, including himself. Boston states that she voluntarily left the employ of FCM in 2005.

Finally, Yelardy contends that a resulting injury is not required to violate the constitutional requirement to provide adequate care.  He argues that the failure to provide him necessary psychological or psychiatric treatment could have resulted in the infliction of pain and suffering.

Yelardy has failed to set forth any evidence suggesting that Boston had any personal involvement in the rendering of mental health services to him.  The only reference to Boston is a notation that she reviewed a mental health examination evaluation form in April 2003.  Nothing indicates any contact between Boston and Yelardy or that she was aware of his alleged physical and mental abuse while in segregation.  Indeed, Yelardy failed to refute Boston's statement that she had not receive verbal or written communication from him regarding the abuse.  Nor does the record indicate that Boston was responsible for housing assignments of pre-trial detainees or medical treatment of inmates with Hepatitis C.  Similarly, a reasonable jury could not find for Yelardy to the extent he relies upon Boston's position as chief psychologist to support his claim.  Finally, Yelardy seemingly concedes that he suffered no injury (i.e., he argues that a resulting injury is not required to violate the constitutional requirement to provide adequate care; and the failure to provide necessary psychological or psychiatric treatment "could have" resulted in the infliction of pain and suffering).  Pursuant to the Prison Litigation Reform Act, an inmate may not recover damages for mental or emotional suffering in the absence of a physical injury: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

Yelardy failed to demonstrate any facts, if proven true, that would show that Boston had personal involvement in Yelardy's alleged constitutional violations.[11] Hence, his claims against her cannot be sustained under § 1983. For the above reasons, the court will grant Boston's motion for summary judgment.

### 3. Medical Needs

Boston also argues that even if she were liable as a supervisor the facts do not establish deliberate indifference to serious medical needs. The second amended complaint alleges that the defendants were deliberately indifferent to Yelardy's medical needs, particularly with regard to the delay or denial in obtaining reading glasses. Yelardy alleges that Green, Boston, and Mann are culpable for violating his constitutional rights.

Courts have concluded that the Fourteenth Amendment affords pretrial detainees protections that are "at least as great as the Eighth Amendment protections afforded to a convicted prisoner." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Hence, when assessing medical claims by pretrial detainees, courts may apply the deliberate indifference standard established under the Eighth Amendment but must view the inquiry in the context of the *Bell v. Wolfish* standard, which applies Fourteenth Amendment due process principles and not the cruel and unusual punishment standard to pretrial detainees. *See Hubbard v. Taylor,* 399 F.3d 150, 165-66 (3d Cir. 2005). The deliberate indifference standard requires a finding of a

---

[11]Boston raises a collateral estoppel defense in support of her motion for summary judgment. The court will not address the issue inasmuch as it determines the record does not support a finding of Boston's personal involvement in the alleged constitutional violations.

serious medical need and acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale,* 318 F.3d at 582.

The record reflects that Yelardy received a response whenever he submitted a request for medical or mental health services. Indeed, the only time that Yelardy submitted a request for mental health treatment, he received it within a week. As to his reading glasses, Yelardy was told time and time again that if he wished to received glasses from outside the HRYCI, they must be sent by his medical provider. Notably, Yelardy ultimately saw an eye doctor and received glasses. Based upon the foregoing, a reasonable jury could not find that Boston was deliberately indifferent to Yelardy's medical needs. Accordingly, the court will grant the State defendants' motion for summary judgment on the medical needs issue.

### C. Default Judgment

The court ordered Mann to either retain new counsel, or inform the court if she intended to proceed *pro se*, and warned her that the "failure . . . to timely comply with this Order shall be considered a failure to defend and the court shall conduct a hearing at some time in the future to determine whether judgment (and in what amount) shall be entered. *(Id.)* Yelardy noted Mann's non-compliance and moved the court to enter judgment in his behalf and to award damages. The court directed the clerk of court to enter default against Mann pursuant to Rule 55(a), and denied without prejudice the motion for default judgment. (D.I. 232, 247.) Yelardy was advised that he could file documentation with the court describing how he has been injured by Mann and that the court would determine whether default judgment and/or damages were appropriate based on his filing and the other papers of record.

-13-

Entry of default judgment is a two-step process. Fed. R. Civ. P. 55(a), (b). A party seeking to obtain a default judgment must first request that the clerk of the court "enter . . . the default" of the party who has not answered the pleading or "otherwise defend[ed]," within the time required by the rules or as extended by court order. Fed. R. Civ. P. 55(a). Even if default is properly entered, the entry of judgment by default pursuant to Rule 55(b)(2) is within the discretion of the trial court. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984). Three factors control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied; (2) whether the defendant appears to have a litigable defense; and (3) whether defendant's delay is due to culpable conduct. *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000) (citing *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984).

Yelardy's claims against Mann are related to his successful quest to obtain eyeglasses. He filed an affidavit wherein he avers that Mann participated in a pattern and practice of unreasonable deliberate indifference to his medical needs; he suffers and continues to suffer from degenerative eyesight as a result of her indifference; he is unable to obtain an independent medical examination to determine the extent of damages caused by the extended period of eye strain; and he is unable to provide additional documentation to support his injuries due to Mann's failure to answer and cooperate in the discovery process. Yelardy seeks one hundred thousand dollars in damages for "the rampant disregard of his medical needs" by Mann.

Mann addressed one of Yelardy's grievances seeking reading glasses. Yelardy testified he included Mann as a defendant because it "took too long" for him to receive his eyeglasses "although she actually resolved the problem." He was without reading glasses for a five-month

-14-

period, from March until August.  While the lack of reading glasses caused eye strain, a few headaches, and perhaps a worsening of his vision, Yelardy was not told that his vision was severely damaged.

The record does not support a finding that Mann violated Yelardy's constitutional rights. Indeed, it is evident that her intervention facilitated Yelardy's procument of reading glasses and, by Yelardy's own admission, he included her as a defendant merely because it took too long for him to obtain the glasses.  The record does not support a finding that Mann's actions or inactions were the cause of his alleged injury.  Finally, Yelardy's claim of degenerative eyesight as a result of Mann's alleged indifference is not borne by the record.

The court has thoroughly reviewed the record, found no evidence of culpability by Mann, no evidence of injury to Yelardy as a result of Mann's actions or inaction, and no evidence to support a hearing on compensatory damages.  Therefore, the court will exercise its discretion and decline to enter default judgment against Mann.  She will be dismissed without prejudice as a defendant.  *See Teters v. Aguirre*, 114 F. App'x 946 (9th Cir. 2004) (not reported) (district court properly determined that the plaintiff was not entitled to damages, and dismissed the action *sua sponte*, because the allegations contained in the amended complaint were insufficient to provide a legal remedy.).

**D. Service**

On November 20, 2009, the court ordered Yelardy to serve Green within twenty-one days from the date of the order.  Yelardy was warned that failure to comply with the order would result in Green's dismissal as a defendant.  (D.I. 247.)  To date, Green has not been served.

Therefore, he will be dismissed without prejudice as a defendant, for failure to serve process, pursuant to Fed. R. Civ. P. 4(m).

## V. CONCLUSION

For the above stated reasons, the court will deny Yelardy's request for counsel, deny as moot the motion for extension of time, deny the request for a hearing and for default judgment, and will grant Boston's motion for summary judgment. The court will dismiss without prejudice the defendants Mann and Green.

An appropriate order will be entered.

_____

CHIEF UNITED STATES DISTRICT JUDGE

_____ June 14 _____, 2010

Wilmington, Delaware

-16-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STANLEY YELARDY,                          )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )   Civil Action No. 03-1032-GMS
                                          )
SGT. DEMETRIUS GREEN, et al.,             )
                                          )
            Defendants.                   )

## ORDER

At Wilmington this _11th_ day of _____June_____, 2010, for the reasons set forth in

the Memorandum issued this date;

1.  The plaintiff's request for counsel is **denied**.  (D.I. 249.)

2.  The plaintiff's request for default judgment and hearing is **denied** and the defendant

Susan Mann is **dismissed without prejudice**.  (D.I. 250.)

3.  The defendant Martha Boston's motion for summary judgment is **granted**.  (D.I. 256.)

4.  The plaintiff's request for counsel is **denied** as moot.  (D.I. 258.)

5.  The defendant Daniel Green is **dismissed without prejudice** pursuant to Fed. R. Civ.

P. 4(m).

6.  The clerk of the court is directed to enter judgment in favor of the defendants and

against the plaintiff and to **close** the case.

CHIEF, UNITED STATES DISTRICT JUDGE